Radiation Oncology Servs. of Cent. N.Y., P.C. v Our Lady of Lourdes Mem. Hosp., Inc. (2025 NY Slip Op 06112)

Radiation Oncology Servs. of Cent. N.Y., P.C. v Our Lady of Lourdes Mem. Hosp., Inc.

2025 NY Slip Op 06112

Decided on November 6, 2025

Appellate Division, Third Department

Fisher, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided and Entered:November 6, 2025

CV-24-1414

[*1]Radiation Oncology Services of Central New York, P.C., et al., Appellants-Respondents,
v
Our Lady of Lourdes Memorial Hospital, Inc., Respondent- Appellant.

Calendar Date:September 5, 2025

Before: Pritzker, J.P., Lynch, Fisher and Mackey, JJ.

William J. Leberman, Syracuse and Goldberg Segalla, Buffalo (Meghan M. Brown of counsel), for appellants-respondents.
Hinman, Howard & Kattell, LLP, Binghamton (Jeanette N. Warren of counsel), for respondent-appellant.

Fisher, J.
(1) Cross-appeals from an order of the Supreme Court (Mark Masler, J.), entered July 22, 2024 in Cortland County, which, among other things, partially granted plaintiffs' motion in limine, and (2) appeal from an order of said court, entered September 17, 2024 in Cortland County, which, among other things, denied plaintiffs' motion in limine.
The underlying facts of this matter are familiar to this Court, having been the subject of two prior appeals (221 AD3d 1324 [3d Dept 2023]; 148 AD3d 1418 [3d Dept 2017]). As relevant here, plaintiff Michael J. Fallon is a physician specializing in radiation oncology and is sole shareholder of plaintiff Radiation Oncology Services of Central New York, P.C. (hereinafter ROSCNY), a professional service corporation organized under the laws of New York. In 2001, ROSCNY entered into a written coverage agreement with defendant, under which ROSCNY was granted the exclusive right to provide oncology services at the hospital, with Fallon serving as medical director of the department.[FN1] In 2015, following an independent review of Fallon's charts which revealed quality of care issues, defendant precautionarily suspended Fallon's clinical privileges and, within one day of reinstating his privileges with certain conditions, terminated Fallon and ROSCNY's services for an alleged breach of the agreement.
Plaintiffs commenced this action asserting causes of action for, among others, breach of contract, wrongful termination, libel and slander. Following the completion of disclosure and motion practice, a judgment was entered in favor of plaintiffs on the four remaining causes of action for breach of contract. A jury trial on damages was scheduled, and the parties filed respective motions in limine disputing the method of calculating damages and whether evidence of Fallon and ROSCNY's duty to mitigate the damages suffered from defendant's breach may be submitted to the jury. Such dispute essentially distills to whether the salary paid by a professional service corporation to its sole shareholder must be treated as an expense in calculating the lost profits, thus subtracting it from the corporation's profits and correspondingly reducing its damages. Supreme Court, in a pair of well-reasoned decisions, determined that Fallon's salary as paid by ROSCNY under the coverage agreement is not an expense and could be recoverable as damages for lost profits. Supreme Court further found that evidence of Fallon and ROSCNY's efforts to mitigate the damages suffered from defendant's breach may be submitted to the jury, and whether or not Fallon's postbreach earnings are income derived because of defendant's breach is a question to be resolved by the jury in determining damages. These cross-appeals ensued.
Although we recognize this to be a question of first impression in New York — one which has been answered by other jurisdictions in one of two prevailing approaches that each party advocates for us to adopt — the guiding principles of damages [*2]in contract actions are already well-articulated in New York and lead us to affirm Supreme Court. The fundamental tenet is that the injured party should be left in as good a position as it would have been had the contract been fully performed, at the least cost to the defendant (see Brushton-Moira Cent. Sch. Dist. v Fred H. Thomas Assocs., P.C., 91 NY2d 256, 261 [1998]; Freund v Washington Square Press Inc., 34 NY2d 379, 383 [1974]). Under certain circumstances, an injured party may recover "lost profits resulting from a breach [that are] the natural and probable consequence of that breach" (Biotronik A.G. v Conor Medsystems Ireland, Ltd., 22 NY3d 799, 808 [2014] [internal quotation marks and citation omitted]; see generally Ashland Mgt. Inc. v Janien, 82 NY2d 395, 403 [1993]). However, equally fundamental is that the injured party should not recover more from the breach than it would have gained if there was full performance under the contract (see St. Lawrence Factory Stores v Ogdensburg Bridge & Port Auth., 121 AD3d 1226, 1227 [3d Dept 2014], lv denied 25 NY3d 907 [2015]). Therefore, when an injured party, now relieved of its contractual obligations by a breach, had an opportunity to earn or could with reasonable diligence earn additional income during the unexpired term of the now-broken agreement, the damages award should be reduced by those sums to reflect an accurate loss of the net profit (see Rebh v Lake George Ventures Inc., 241 AD2d 801, 803 [3d Dept 1997]; Donald Rubin, Inc. v Schwartz, 191 AD2d 171, 171-172 [1st Dept 1993]; see also Federico v Brancato, 188 AD3d 1158, 1161 [2d Dept 2020]). Such diminishment is consistent with the duty imposed on the injured party to make reasonable efforts to minimize the damages sustained by the breach of a contract (see Wilmot v State of New York, 32 NY2d 164, 168-169 [1973]; see generally Fitzpatrick v Animal Care Hosp., PLLC, 104 AD3d 1078, 1082 [3d Dept 2013]).
With that backdrop, we turn to the positions of the parties, who recognize that salaries paid to shareholders and principals are ordinarily treated as an avoidable expense in corporations and subtracted from the damages resulting from a breach (see R & I Elecs. v Neuman, 66 AD2d 836, 838 [2d Dept 1978]). Where they disagree is whether professional service corporations should be entitled to different treatment. Plaintiffs contend they should, because only a licensed physician can be a director, officer or shareholder of a professional service corporation formed for the purpose of providing medical services (see Business Corporation Law §§ 1507, 1508). Due to this, a professional service corporation can and often does, as ROSCNY has done since its formation in 2001, make a federal tax election that permits it to pay all or nearly all of its net profit to its shareholders as a fully deductible expense. By passing on the entire net profit to the shareholder, such as Fallon, professional service corporations like ROSCNY avoid unnecessary taxation [*3]on both the corporation and the shareholder. But by doing so, the net profit of a professional service corporation becomes greatly reduced or eliminated, resulting in virtually no recovery from a breach of contract action — even one which results in no profits subsequently being passed on to shareholders during the remaining term of such agreement. Based on these circumstances, plaintiffs rely on the treatment afforded to professional service corporations and shareholders in Bettius & Sanderson, P.C. v National Union Fire Ins. Co. of Pittsburgh (839 F2d 1009 [4th Cir 1988]), which held that treating the salaries paid to principals in a professional service corporation — who were also the shareholders — as an expense would preclude such corporations from ever being able to prove damages for lost profits by another party's wrongful act. In reaching this conclusion, the Fourth Circuit found that traditional business corporations and professional service corporations were dissimilar in structure and exist for different purposes (id. at 1013). For instance, in a traditional business corporation, the shareholders own a percentage of the corporation but rarely partake in the day-to-day operations of the business (id.). Rather, a business corporation pays salaries to its employees to perform such daily tasks, which are then treated as an expense from the corporation's gross profit, from which the remaining net profit is either divided to the shareholders or retained by the corporation for other purposes (id.). However, in a professional service corporation, the shareholders are themselves actively involved in the day-to-day affairs of the corporation, functioning as employees rendering services under a professional license who are generating the net profit for the corporation and themselves (id.).
In contrast, defendant contends that professional service corporations should be treated like other corporations for the purposes of calculating damages, and therefore Fallon's salary is an expense to ROSCNY that becomes an avoided cost upon the breach of the coverage agreement. Defendant's position is consistent with Anesthesiologists Assocs. of Ogden v St. Benedict's Hosp. (884 P2d 1236 [Utah 1994]), which held that the compensation to shareholders in their roles as employees could not be considered as part of a professional corporation's lost profits. In reaching this holding, the Supreme Court of Utah rejected the analysis of the Fourth Circuit in Bettius by recognizing that avoiding double taxation was not a unique trait of professional corporations and, while it may be true that shareholders and employees/principals could be the same people in many professional service corporations, that may not always be the case (id. at 1239). Relying on a similar case from Florida, the Supreme Court of Utah further reasoned that professionals who incorporate under one corporate form should not be allowed to enjoy the advantages of such form without also accepting its disadvantages [*4](id. at 1238-1240, citing Southern Bell Tel. & Tel. Co. v Kaminester, 400 So2d 804, 807 [Fla 3d Dist Ct App 1981]). In finding that the distinctions between business and professional corporations did not justify an exception or unconventional measure of damages to treat professional service corporations differently, the Supreme Court of Utah applied the standard rule that "salaries of corporate employees are generally deducted from the damages awarded to conventional corporations . . . because salaries not paid to employees are viewed as saved costs of performing the contract and therefore are not an element of the corporation's damages" (id. at 1238). To the extent that there was a perceived inequitable outcome, the Supreme Court of Utah considered this a casualty of the corporate form chosen by the professionals, who should not receive different treatment merely due to their professional license (id. at 1241).
In considering these approaches, we cannot say that the approach adopted by the Supreme Court of Utah most embodies the present state of law in New York. Although we agree that when a professional or group of professionals decides to incorporate they assume the advantages of such incorporation as well as the disadvantages, a formalist application of a standard rule of damages applicable to all corporations leads to "inflexible rule[s] of damages," which have been continuously rejected by our courts for over a century (Spitz v Lesser, 302 NY 490, 493-494 [1951]; see Ehrenworth v Stuhmer & Co., 229 NY 210, 221 [1920] ["No one rule as to damages can be adopted to fit every case. As the circumstances differ, so must the rule"]). Moreover, adopting the approach by Anesthesiologists Associates would also serve to insulate wrongdoers from liability simply because a professional corporation had decided to run its business in the most tax-efficient manner. This cuts against our well-established rule of damages that an injured party is entitled to fair and just compensation commensurate with the party's losses (see E.J. Brooks Co. v Cambridge Security Seals, 31 NY3d 441, 448 [2018]; Bibeau v Ward, 228 AD2d 943, 945 [3d Dept 1996], lv denied 89 NY2d 804 [1996]). It also would result in the "unrealistic [situation] . . . that the corporation [was] not earning a profit" pursuant to a coverage agreement worth several hundred thousand dollars a year, or more (Bettius & Sanderson, P.C. v National Union Fire Ins. Co. of Pittsburgh, 839 F2d at 1013).
In our view, the approach enunciated by the Fourth Circuit represents a more accurate balancing of the unique traits of professional corporations with the established principles of damages in New York. While our Legislature has created significant overlap between professional service corporations and traditional business corporations (see Business Corporation Law § 1513), we cannot ignore the inherent distinctions, particularly "the principal capital of a professional corporation being its human capital — the [*5]skills and reputation and contacts of its professional employees" (Hoagland ex rel. Midwest Transit, Inc. v Sandberg, Phoenix & von Gontard, P.C., 385 F3d 737, 742 [7th Cir 2004]). Indeed, the backbone of a professional corporation are its licensed professionals, who are the only ones who can serve as shareholders or officers (see Business Corporation Law §§ 1507, 1508), or render professional services on behalf of the corporation (see Business Corporation Law § 1504) — while remaining "personally and fully liable" for their negligent or wrongful acts (Business Corporation Law § 1505 [a] [i]). Although it is true that the shareholders and employees/principals of a professional service corporation may not always be the same people, as the record confirms that ROSCNY also used locum tenens physicians (temporary providers) when Fallon was unavailable, those fees are accountable as expenses to ROSCNY and are materially different than the revenue generated by Fallon — who was responsible for earning the vast majority of revenue for ROSCNY through the coverage agreement with defendant. To then erase all or nearly all of the damages caused by defendant's breach under that agreement because ROSCNY passed on its net profits to its sole shareholder generating those revenues, would then prevent it from recovering any fair and just compensation owed to it as the nonbreaching party under the rules applicable to traditional corporations (see Bettius & Sanderson, P.C. v National Union Fire Ins. Co. of Pittsburgh, 839 F2d at 1013-1014). Accordingly, in recognition that the majority of other jurisdictions have adopted the stance taken by the Fourth Circuit in Bettius, we are satisfied that Supreme Court properly held that Fallon's salary as paid by ROSCNY under the coverage agreement is not an expense and could be recoverable as damages for lost profits (see Atkins v Robbins, Salomon & Patt, Ltd., 2018 IL App [1st] 161961, 97 NE3d 210, 229 [App Ct of Ill (1st Dist) 2018]; Stat Imaging, LLC v Med. Specialists, Inc., P.C., 2014 WL 5310256, *3, 2014 US Dist LEXIS 148597, *8-9 [ND IL, Oct. 17, 2014, No. 13C1921]; Sisters of Providence in Washington v A.A. Pain Clinic, Inc., 81 P3d 989, 1006 [Alaska 2003]).
Turning to the issue of mitigation, plaintiffs contend that Supreme Court erred in allowing defendant to present to the jury evidence of Fallon's efforts to mitigate the damages caused by defendant's breach and evidence of Fallon's postbreach income. We find no such error. Although plaintiffs are correct that Fallon was not a party to the coverage agreement between ROSCNY and defendant, and therefore generally may have had no duty to mitigate damages as a third party, this contention ignores the realities that Fallon was the actor through which ROSCNY operated. As recognized above, Fallon was the sole shareholder and officer of ROSCNY, and was therefore the decisionmaker for how ROSCNY would move forward from defendant's breach of the coverage agreement. Since he was [*6]also the primary source of revenue for ROSCNY, Fallon would also be the primary source of offsetting the damages caused by the breach. He does this by rendering professional services through his medical license, as limited by the number of hours he could perform such services treating patients or serving as medical director. Fallon's importance to ROSCNY's performance of the coverage agreement is further recognized by its terms, which permitted defendant to immediately terminate the agreement in the event of his disability, death or separation from ROSCNY. Ignoring these points to hold there was no duty to mitigate damages would just serve to undermine our holding that Fallon's salary was not an expense to ROSCNY because of the unique nature of professional corporations generating revenue through their licensed professionals. It would also uncoil the justification for this holding, which is aimed at preventing a windfall for the breaching party in a contract with a professional corporation that had no damages by virtue of such corporation passing on its net profits to its shareholders. But as advocated by plaintiffs, they seek to enjoy the benefit of this rule while avoiding their duty to mitigate damages, now allowing them to be the ones to create a windfall by maximizing their recovery for lost profits (see Gosden v Elmira City Sch. Dist., 90 AD3d 1202, 1204 [3d Dept 2011]). Said differently, it would essentially create the proverbial sword and shield for professional corporations and their shareholders, which is inconsistent with how damages awards are measured in contract actions (see Freund v Washington Square Press Inc., 34 NY2d at 383; St. Lawrence Factory Stores v Ogdensburg Bridge & Port Auth., 121 AD3d at 1227).
We find this to be particularly salient where, as here, the record reveals that Fallon, in entering into a new coverage agreement with another hospital, did so through a different professional corporation owned by him, instead of ROSCNY, to avoid "unnecessarily" exposing new income generated by ROSCNY to a counterclaim asserted in this action.[FN2] Although plaintiffs clarified that such statement did not refer to maximizing the damages sustained by ROSCNY and further highlighted that Fallon had preexisting relationships with other entities for which he was performing medical services during the same time period of the coverage agreement with defendant, by virtue of having more hours to practice medicine because he was not working at defendant's hospital, Fallon's ability to earn additional revenue during the unexpired term of the coverage agreement should be considered by the jury in determining the lost profits award (see Cornell v T.V. Dev. Corp., 17 NY2d 69, 74-75 [1966]; Rebh v Lake George Ventures Inc., 241 AD2d at 803; Donald Rubin, Inc. v Schwartz, 191 AD2d at 171-172). Supreme Court appropriately balanced Fallon's multiple sources of income by allowing the jury to consider whether the postbreach opportunities Fallon had to [*7]earn income from other contracts and professional services were increased as a direct result of defendant's breach (see Federico v Brancato, 188 AD3d at 1161; Tendler v Bais Knesses of New Hempstead, Inc., 112 AD3d 911, 912 [2d Dept 2013]). Accordingly, we discern no reason to disturb Supreme Court's determination. We have examined the remaining contentions of the parties and have found them to be without merit or rendered academic.[FN3]
Pritzker, J.P., Lynch and Mackey, JJ., concur.
ORDERED that the orders are affirmed, without costs.

Footnotes

Footnote 1: This agreement has been amended three times, with the last amendment occurring in 2014.

Footnote 2: Such counterclaim has since been dismissed.

Footnote 3: Contrary to plaintiffs' contention, Supreme Court accurately determined that the maximum term of the coverage agreement for which damages could be awarded was limited by, among other events, if Fallon ceased to provide services to defendant as medical director.